[837 NYS2d 398]

In the Matter of JULIA BB. and Others, Children Alleged to be Severely Abused, Repeatedly Abused, Abused and/or Neglected. SARATOGA COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent-Appellant; DIANA BB., Appellant-Respondent. (Proceeding No. 1.) In the Matter of JULIA BB. and Others, Children Alleged to be Severely Abused, Repeatedly Abused, Abused and/or Neglected. SARATOGA COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent-Appellant; FRANCIS BB., Appellant-Respondent. (Proceeding No. 2.)

Third Department, May 31, 2007

### APPEARANCES OF COUNSEL

*Cynthia Feathers*, Delmar, for appellants-respondents.

*Mark M. Rider, County Attorney*, Ballston Spa (*Nicholas E. Tishler*, Niskayuna, of counsel), for respondent-appellant.

*Mark A. Kassner, Law Guardian*, Schenectady.

*Anne Reynolds Copps*, Albany, for Louis S. and another.

### OPINION OF THE COURT

CREW III, J.P.

Respondents are the biological parents of three children, John (born in 2000), Emily (born in 2001) and Julia (born in 2003). Five days after her birth in late October 2003, Julia was taken to her pediatrician, Sushila Sood, for her first well-baby visit and everything was normal. Sood, a board-certified pediatrician, also had treated John and Emily since their respective births.

A short time later, on November 18, 2003, respondent Diana BB. (hereinafter the mother), returned to Sood with Julia and expressed concern regarding some marks that had appeared on Julia's back and chest. Sood observed "linear purpuric areas"[1] on Julia's back and a small bruise[2] on her right leg. None of the physicians in Sood's office was able to offer a definitive diagnosis, so Julia was referred to Joan Porter, a specialist in hematology at Albany Medical Center (hereinafter AMC), for additional blood work, which yielded a provisional diagnosis of hemorrhagic vasculitis, an inflammation of the blood vessels. Julia also was observed to have low levels of protein C, which is needed for blood coagulation. The skin discolorations noted at this office visit, together with other small bruises, would come and go in the months that followed.

Julia returned to Sood's office one week later for her one month checkup, at which time fresh purpuric spots were

---

**1.** These are small purple or blue dots, described by Sood as "little hemorrhages underneath the skin," that were, at various points in the record, incorrectly characterized as a "rash."

**2.** Although the term "bruise" appears throughout the record on appeal and this Court's decision, Sood testified that the vast majority of the "bruises" she observed on Julia were not "regular bruises" in the sense that they did not progress from black and blue to green to yellow but, rather, appeared as small blue dots that would disappear in a day or so. According to Sood, Julia did not react when these spots, which could been seen *through* the skin, were touched. Sood further testified that she did not see any abrasions or lesions on Julia and was adamant that the purpura and bruises she observed were not caused by trauma.

observed. Sood repeated blood work at that time, but no new information was revealed. A few days later, on November 29, 2003, respondents again brought Julia to the pediatrician's office, this time expressing concern about "crackling" noises they heard on the left side of Julia's chest. Julia was seen by one of Sood's partners, who sent her to AMC for X rays, which initially revealed the possibility of a rib fracture. Respondents returned with Julia on December 1, 2003, at which time Sood could hear the crepitus in Julia's left chest wall. Although Sood also observed a small bruise on Julia's left cheek, she did not see any evidence of injury to Julia. Sood requested that another X ray be taken but ultimately was told by radiologists at AMC that this was unnecessary as there was no evidence of a fracture on the November 29, 2003 films. Instead, it was believed that the crepitus was resulting from an overriding of Julia's fourth and fifth ribs.

At this point, Sood referred Julia back to Porter for additional blood work. Based upon a small bruise observed behind Julia's ear and the hemorrhagic areas previously observed, Porter ordered a head CT, which ultimately revealed a superficial linear skull fracture.[3] As a result, Julia was admitted to AMC on December 3, 2003, at which time a complete skeletal survey revealed fractures of the ribs, the left forearm and left tibia.[4] While there, Julia underwent genetic testing to determine whether she suffered from osteogenesis imperfecta (hereinafter OI), more commonly known as "brittle bone disease." Darius Adams, the geneticist who conducted such testing, ultimately concluded that Julia did not have OI. Adams noted, however, that the fractures and skin condition evidenced by Julia were associated with OI and, further, that the tests commonly used to detect OI did so with only 85% certainty. Julia, who did not sustain any additional fractures for the remainder of the time period covered by this record, was discharged to respondents' care on December 5, 2003.

As a result of Julia's December 3, 2003 admission to AMC, Child Protective Services was notified and an investigation commenced. From December 5, 2003 until March 7, 2004, Julia was

---

3. No evidence of brain hemorrhaging was observed.

4. The fracture of the left tibia was characterized as a "green stick" fracture, meaning that it was not a complete break. Whether these fractures were in various stages of healing or occurred at or near the same point in time is unclear from the medical testimony, but it appears that the fractures depicted on the December 3, 2003 X rays were not present on the November 29, 2003 X rays.

seen every day by either Sood, one of her partners, a visiting nurse or one of petitioner's caseworkers. During this period, the episodes of purpura, together with incidents of swelling of Julia's fingers, nose and head and bouts of profuse sweating, continued to come and go.

In the interim, on December 17, 2003, and at respondents' request, Sood referred Julia to James Slavin, an orthopedic surgeon, for an evaluation. After examining Julia, reviewing her previous X rays and speaking with Sood, Slavin ultimately concluded that Julia was the victim of child abuse and, based upon that assessment, petitioner sought emergency removal of Julia on December 18, 2003. Family Court (Hall, J.) denied petitioner's application, finding that respondents were "doing all that [was] reasonable at [that] point with continuing and regular medical monitoring to attempt to address their child's difficulties." Although acknowledging that Julia was suffering from unexplained medical injuries, Family Court stated that it was not persuaded "by [the relevant] testimony that these unexplained injuries are the result of abuse or some sort of inappropriate conditions in the homestead," nor was it persuaded that "an emergency removal would preserve or protect [Julia] in any better fashion than her parents [were] doing." Respondents were directed to continue to cooperate with petitioner and, by all accounts, they did precisely that by, among other things, signing the appropriate releases, taking Julia to Sood's office at least twice a week and permitting the routine home visits by visiting nurses and petitioner's caseworkers.[5]

A short time later, Julia's paternal grandmother moved in with respondents to assist in caring for Julia and her siblings. The grandmother testified that during the approximately three months she stayed with respondents, Julia's blotchy "grape jelly" marks, often appearing as little red dots, would come and go "out of the blue." During this time period, the grandmother also noted intermittent puffiness or swelling of the joints of Julia's fingers. As to respondents' relationship with Julia, the grandmother testified that Julia was a planned pregnancy, respondents were thrilled with the prospect of another child and they were very concerned about Julia's apparent medical

---

**5.** Slavin, who testified at the emergency removal hearing, vehemently disagreed with the decision to deny petitioner's application and, in the months that followed, actively sought to have respondents investigated and/or prosecuted criminally for child abuse, authoring letters to both petitioner and the local District Attorney.

condition and cooperated fully with petitioner. The grandmother also testified at length regarding how careful respondents were in holding and transporting Julia, often carrying her on a pillow, and how the mother had modified Julia's clothing and her diapering procedure in order to avoid undue stress on or unnecessary movement of Julia's limbs.[6]

On March 3, 2004, Julia appeared to be very congested and was brought to Sood's office where she was diagnosed with an ear infection and placed on amoxicillin. On the evening of March 7, 2004, Julia was fed, given a dose of amoxicillin and put to bed by respondents. A few minutes later, Julia started to cry, could be heard coughing and appeared to be having difficulty breathing.[7] Respondents immediately dialed 911 and the responding EMTs placed an oxygen mask on Julia's face and, shortly thereafter, transported Julia to Ellis Hospital. While treating her, the EMTs observed a bright pink secretion around Julia's mouth—apparently consistent with the color of amoxicillin—and that she coughed up a "mucus plug."

Julia initially was treated at Ellis Hospital by Jerald O'Brien, who diagnosed Julia as suffering from pulmonary edema. As soon as Julia was stabilized, she was transferred to the pediatric intensive care unit at AMC, where she was treated by Javier Sanchez. Although O'Brien observed that Julia had some bruising and/or bleeding in the area of her lips and gums, he acknowledged that the mask applied by the EMTs could have caused this. Nonetheless, he advised Sanchez that he believed this to be a "smothering incident." Sanchez concurred with O'Brien, taking the position that Julia had been the victim of child abuse.

The following day, petitioner again sought emergency removal—this time of all three children, and Family Court (Seibert, J.) granted the application as to Julia. One week later, on March 15, 2004, Julia was discharged to Sunnyview Rehabilitation Hospital, where she remained for one month. While at Sunnyview, Julia continued to display intermittent skin discolorations, there was an incident of unexplained blood in her saliva and she had one episode of staring. Her slight facial droop, first noted upon her March 2004 admission to AMC, as well as the periodic decreased mobility of her right arm, persisted as well.

---

**6.** The grandmother concluded her testimony by emphatically stating that she never saw respondents (or anyone else, for that matter) harm Julia and, had she observed such behavior, she would have notified the authorities and removed the child from the home herself.

**7.** The grandmother was present for this event.

Following her discharge from Sunnyview, Julia was placed in foster care. While in foster care, Julia experienced an unexplained swelling of one of her toes, for which the foster parents sought medical treatment, and additional bruises and skin discolorations were noted from time to time.

Petitioners thereafter commenced the instant proceedings against respondents alleging that respondents severely and/or repeatedly abused Julia and, further, abused and neglected John, Emily and Julia, ultimately seeking to terminate respondents' parental rights as to Julia. A lengthy fact-finding hearing ensued, at the conclusion of which Family Court (Abramson, J.) found that respondents abused and severely abused Julia and, derivatively, neglected John and Emily.

Following the close of proof but prior to the issuance of Family Court's fact-finding decision, respondents moved by order to show cause to permit Julia to be examined by physicians Leon Root, a board-certified orthopedic surgeon and a recognized expert in orthopedics, pediatric orthopedics and on the subject of OI, and Thomas Lehman, a board-certified physician specializing in pediatrics and pediatric rheumatology, and to reopen the proof in order to admit their testimony. Family Court denied respondents' motion to reopen but granted their request to have Julia examined by Root and Lehman, holding that the resulting testimony would be permitted at the dispositional hearing. Following that hearing, Family Court, among other things, terminated respondents' parental rights as to Julia and dispensed with the requirement of diligent efforts to reunite Julia with respondents, thus freeing her for adoption. Family Court also imposed a three-year order of disposition with regard to John and Emily, subjecting respondents to, among other things, unannounced home visits. Respondents appealed and petitioner cross-appealed, although it appears that such cross appeal has been abandoned. This Court (Spain, J.) granted respondents' subsequent motion for a stay pending appeal, thereby, among other things, continuing Julia's visitations with respondents, John and Emily and directing that no final order of adoption be made as to Julia.[8]

■ Preliminarily, we are of the view that the finding of derivative neglect as to John and Emily cannot be sustained upon this record. To be sure, proof of the abuse or neglect of one

8. At the time of oral argument, physical custody of Julia alternated between the foster parents and Julia's paternal aunt and uncle, the latter of whom had filed for custody of Julia.

child is admissible as to the proof of neglect of another child (*see* Family Ct Act § 1046 [a] [i]) but, even accepting, for purposes of this discussion, that Julia indeed was abused or neglected, there simply is no evidence whatsoever that John and/or Emily's physical, mental or emotional well-being was impaired or was in danger of becoming impaired as the result of respondents' conduct—either as to Julia or otherwise (*see* Family Ct Act § 1012 [f]). Indeed, the record as a whole reflects that John and Emily thrived in respondents' care.

Sood, who, as noted previously, treated John and Emily since their respective births, testified without contradiction that respondents were attentive and loving parents, that John and Emily attended all necessary or recommended evaluations and examinations, that their immunizations were up to date and that they were healthy and happy children, in whom she had never seen any evidence of abuse or maltreatment. Her conclusions in this regard were substantiated by, among other things, full-body skeletal X rays of John and Emily taken in April 2004, which did not reveal any evidence of past or existing fractures. In short, there is nothing in the record to demonstrate that John and Emily were neglected by respondents and, as such, Family Court's findings in this regard cannot stand.

■ Before addressing the evidence adduced as to Julia, one procedural matter must be resolved—namely, whether Family Court abused its discretion in denying respondents' motion to reopen the proof as to the testimony offered by Root and Lehman. In our view, the short answer to this inquiry is "Yes."

To be sure, "the order of introducing evidence and the time when it may be introduced are matters generally resting in the sound discretion of the trial court" (*Feldsberg v Nitschke*, 49 NY2d 636, 643 [1980]; *see* CPLR 4011) and, as such, the trial court has the power to permit or preclude the introduction of evidence after the close of the offerer's case (*see Feldsberg v Nitschke, supra* at 643). Here, the record reflects that respondents moved to reopen within days of summations, offered a cogent explanation as to why the requested testimony had not been offered sooner, specified who would be testifying, what the proof would be and how it related to the central dispute in these matters (*compare Matter of Pandozy v Dwayne OO.*, 144 AD2d 739, 740 [1988] ["court's decision to proceed was well within its discretion given the delay, the absence of any indication that the missing witness's testimony would add anything to the record, and the clear and convincing evidence (already) adduced"]; *Pe-*

*troleum Serv. Co. v Steel City Painting Co.*, 115 AD2d 872, 873-874 [1985] [party moved to reopen in a timely fashion but failed to identify who or where its expert was and when such expert could be produced for trial]). Under such circumstances, and given the complex and contested medical issues presented here, as well as the ultimate question posed for our consideration—namely, whether respondents' parental rights should be terminated, we believe that it was an abuse of discretion for Family Court to deny respondents' motion to reopen and, in so doing, preclude them from offering testimony crucial to both a key aspect of their defense and a central issue in the case at large.

■ Turning to the merits, a child may be deemed severely abused if "the child has been found to be an abused child as a result of reckless or intentional acts of the parent committed under circumstances evincing a depraved indifference to human life, which result in serious physical injury to the child as defined in [Penal Law § 10.00 (10)]" (Social Services Law § 384-b [8] [a] [i]; *see Matter of Alijah C.*, 1 NY3d 375, 378 [2004]). "Serious physical injury," in turn, is defined as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ" (Penal Law § 10.00 [10]). A finding of severe abuse must be based upon clear and convincing evidence (*see* Family Ct Act § 1046 [b] [ii]; § 1051 [e]; *see Matter of Alijah C., supra* at 378 n 2; *Matter of Candace S.*, 38 AD3d 786, 788 [2007]). In our view, that standard has not been met here.

As a starting point, there is no direct evidence of respondents' intent and/or recklessness. Additionally, while it is true that depraved indifference may be established by circumstantial evidence (*see People v Feingold*, 7 NY3d 288, 296 [2006]), we find such proof to be lacking here. Indeed, the record is replete with references to respondents' efforts to obtain medical care for Julia and attempts to unravel what they contend is a medical problem.

As to Julia's specific injuries, while she did sustain certain fractures and display various bruises, skin discolorations and other unusual symptoms during the first few months of her life, the record fails to establish that any of these injuries were life threatening or resulted in a protracted impairment of Julia's health (*compare Matter of Jessica MM.*, 122 AD2d 462, 464 [1986], *lv denied* 68 NY2d 612 [1986] [radiologist specifically

testified that fractures suffered by the infant could have been life threatening due to possibility of liver or spleen damage]). Hence, in our view, the finding of severe abuse stands or falls upon the basis of the alleged "smothering incident" on March 7, 2004.

In this regard, there is no question that Julia suffered some sort of airway obstruction on that date, as a result of which she became gravely ill. Indeed, respondents were told at one point that Julia might die and, as a result, they had her christened at the hospital. Although a subsequent CAT scan and MRI study revealed no blood or lesions on or swelling of the brain, Sanchez testified that Julia did have some developmental deficits, most likely the result of a lack of oxygen to the brain. This episode, therefore, plainly qualifies as a "serious physical injury." What remains for our consideration is whether the record establishes, by clear and convincing evidence, that Julia's parents were the source of such oxygen deprivation.

On this point Sanchez, who at the time of Julia's March 2004 hospital admission was aware of Julia's December 2003 admission to AMC and the suggestion that she was the victim of child abuse, testified that Julia's differential diagnosis was pulmonary edema, which he believed to be the product of a "smothering incident." Sanchez conceded, however, that he had no proof of that. Indeed, when questioned by the Law Guardian as to the basis for such opinion, the following exchange occurred.

"A. I, to that conclusion, I basically get there because I have nothing else that fits.

"Q. Okay.

"A. Okay, so—

"Q. So it's like a last resort?

"A. Right. That's basically how I get there."

Sanchez testified, however, that he observed no bruises or marks around Julia's mouth or throat.[9] And while Sanchez ruled out infectious disease, aspiration or an internal obstruction as possible causes of Julia's breathing difficulties and felt that it was unlikely that Julia could have choked on enough formula, cereal or amoxicillin to cause a breathing problem without also

---

**9.** As noted previously, although O'Brien observed some bleeding and/or bruising in the area of Julia's lips and gums upon her arrival at Ellis Hospital, he acknowledged that the oxygen mask applied by the EMTs could have caused this.

aspirating enough fluid to cause pneumonia, he acknowledged that this latter scenario was possible. Finally, when confronted with the records from Julia's brief stay at Ellis Hospital, Sanchez recalled that, according to such records, Julia was suctioned by the EMTs while treating her and that she subsequently coughed up a mucus plug.

Moreover, as will be discussed in greater detail infra, it is apparent from even a cursory review of Sanchez's testimony that his opinion that Julia was the victim of child abuse is, in essence, a default diagnosis. When asked how he made the self-described "huge leap" from the signs and symptoms Julia displayed to the diagnosis of child abuse, Sanchez testified that he took the "constellation of signs and symptoms" Julia displayed and attempted to "come up with one consistent explanation for what happened" to her. According to Sanchez, "kids have one illness at a time" and one "really [has to] go out of the way to make a kid sick." As for the specialists that examined Julia prior to her March 2004 admission to AMC, Sanchez was of the view that they were "single organ doctors" who viewed Julia's various maladies in isolation, whereas it was his job to "end up with a unifying diagnosis trying to answer everything that's happened." In his view, that "unifying diagnosis" was child abuse.

Among the various flaws in that premise is the very real possibility that the fractures detected in December 2003 and the subsequent March 2004 choking incident are entirely unrelated. Additionally, Sanchez's conclusion that the March 2004 incident was the product of an external obstruction, i.e., smothering, ignores the fact that Julia appeared in Sood's office four days earlier very congested, was placed on an antibiotic the color of bubble gum, was fed and given that medication shortly before being put to bed on the night in question, was heard crying and choking by respondents and the grandmother shortly thereafter and, upon arrival, was observed by the EMTs to have bright pink secretions around her mouth—again, apparently consistent with the color of such medication—and, subsequently, to have coughed up a mucus plug. In light of such proof, and given the readily apparent deficiencies in Sanchez's testimony, we conclude that petitioner failed to establish, by clear and convincing evidence, that Julia was a severely abused child.[10]

---

**10.** Our conclusion in this regard would be no different if we included the existence of Julia's fractures in our analysis of severe abuse, as neither the

Although not directly raised by respondents, we nonetheless must now determine whether, in the alternative, the proof establishes, by a preponderance of the credible evidence (see Family Ct Act § 1046 [b] [i]), that Julia was an abused child. Despite the lesser burden of proof, we nonetheless are persuaded, based upon our review of the record as a whole, that petitioner's proof falls short of the mark and, as such, the finding of abuse cannot be sustained.

With regard to the episode of pulmonary edema, we are not persuaded that the testimony offered by Sanchez and O'Brien was sufficient to establish that it was more probable than not (see Matter of Nathaniel II., 18 AD3d 1038, 1038-1039 [2005], lv denied 5 NY3d 707 [2005]) that such injury occurred at the hands of respondents. Aside from the noted deficiencies in Sanchez's testimony on this point, it must be recalled that Julia's paternal grandmother was present on the night in question and heard Julia crying and coughing after respondents had put her to bed and returned downstairs. Thus, in order to find that respondents attempted to smother their child, we must accept not only that, after three months of relative peace, and knowing full well that their care of Julia was subject to daily scrutiny, they suddenly decided to harm their child but, further, that they did so in concert and while another adult was present in the home—all of which, the record reveals, is entirely at odds with the evidence of respondents' devotion and skills as parents (see infra).

As to the issue of Julia's fractures, petitioner primarily relies upon the testimony of Sanchez and Slavin in support of its contention that such injuries were the product of abuse. Sanchez testified that his review of the various X rays disclosed what he characterized as "healing fractures" of Julia's ribs. Because such fractures were, to his analysis, in "various stages of healing," this indicated that the fractures did not occur at the same point in time, thus evidencing a pattern of abuse. Sanchez acknowledged, however, that he is neither a radiologist nor an orthopedist, that "[t]here is no place in the record" that describes the fractures in this fashion and that the relevant AMC records simply refer to the documented fractures as

---

type, number nor source of her fractures, the latter of which is a point of considerable dispute (see infra), adds up to clear and convincing evidence of a depraved indifference to human life.

"old."[11] As to whether Julia suffered from OI, Sanchez testified that he never would have ordered genetic testing of Julia based upon her history and presentation because "[s]he did not have blue sclera[12] [and] [t]he bone fractures were in the wrong spots."[13] Again, however, it is apparent from the record that physical abuse was a default diagnosis for Sanchez—a point clearly illustrated by the following excerpt of his testimony. In discussing the various symptoms Julia had displayed—the fractures, the bruising and the episode of pulmonary edema—Sanchez stated:

> "So, when you try to come up with a diagnosis that can explain all of that away in one nice tidy bundle, there is no medical diagnosis that will give you that diagnosis, you know, that will, can give you that explanation. So that's how you fall back to the physical abuse.
>
> "The physical abuse will explain everything that you have seen."

Turning to Slavin's testimony, it will be recalled that Slavin first saw Julia in December 2003 when respondents brought her to his office for an OI evaluation. Upon physical examination of Julia, Slavin noted that Julia had blue sclera, which he stated was consistent with her age, but saw no evidence of burns, bites, bruises, pinch marks, scrapes or other skin abrasions. Slavin documented the fractures depicted on the various X rays and noted that none of the fractures was spiral in nature.[14]

In the report he dictated following his examination of Julia, Slavin stated:

---

11. As noted previously, Julia sustained no "new" fractures between her December 2003 and March 2004 hospital admissions, during which time she was in the care of respondents.

12. Slavin, however, testified that Julia did have blue sclera when he examined her in December 2003—much closer to the time of the actual fractures—and Root observed that Julia had blue sclera when he examined her in April 2005, long after Sanchez had treated Julia. Blue sclera, the record reflects, can be an indication of OI, although, according to Lehman, its presence can be "both over and under interpreted by examining physicians, depending on their level of suspicion."

13. According to Sanchez, who admittedly was not an expert in the field, fractures resulting from OI usually are "gonna be in the limbs because that's the most likely thing that's gonna get snapped around." The much more knowledgeable and seasoned Root (see infra) testified that while rib and skull fractures are not "typical" of OI, such fractures certainly could happen to someone with OI, stating, "I've seen them all in OI."

14. Slavin, under questioning by respondents' counsel, disagreed with the proposition that spiral fractures are an indication of child abuse.

"This child's story remains very confusing. I have never seen [OI] present without fractures at birth and with this type of an x-ray pattern. Certainly the first logical diagnosis would be child abuse. Dr. Sood says that she has known this family for many years and Child Protective Services did an extensive evaluation and no evidence of abuse was noted. This is certainly my impression after spending considerable time with Julia's parents. I think that some form of congenital indifference to pain should be considered as a diagnosis although it does not fully explain all of the fractures. . . .

"I look forward to the results of the genetic testing but I have explained to the family that there are many possible causes for brittle bones that are not easily identified by genetic testing. I have explained to Julia's parents that it may take us a long period of time to figure out exactly what is going on. I would be glad to assist them in any way I can."[15]

Such congeniality and objectivity, however, waned by the time Slavin authored his December 17, 2003 letter to Sood and disappeared entirely by the time he testified at the emergency removal hearing. The reason for this curious epiphany is unclear from the record, particularly in view of the fact that no additional medical information was gleaned, nor did Julia sustain any new injuries or fractures, during the 24-hour period that elapsed between Slavin's evaluation of her on December 17, 2003 and his testimony at the emergency removal hearing on December 18, 2003. What is abundantly clear, however, is that from the emergency removal hearing forward, Slavin was adamant that Julia's fractures were the product of nonaccidental trauma, i.e., child abuse. And, once petitioner's application for emergency removal was denied—a decision with which he vehemently disagreed (believing that the "system had failed [Julia]"), Slavin, who at one point referred to the foster parents as Julia's "adoptive parents,"[16] embarked upon what charitably could be described as a crusade to remove Julia from respondents' care and have them investigated and/or criminally prosecuted for child abuse, authoring letters to petitioner and the District Attorney (*see* n 5, *supra*), as well as showing Julia's X

---

**15.** Notably, Slavin's initial impressions, as set forth in the cited report, mirrored the very conclusions subsequently reached by both Lehman and Root (*see infra*).

**16.** The foster father also is a physician.

rays to his partner, students and "a number of radiologists" in an effort to gain what he described as "additional ammunition" to support his opinion that Julia had been abused.

Although Sanchez and Slavin each testified to a reasonable degree of medical certainty that Julia's fractures were the product of child abuse, the cited deficiencies in their respective testimony—be it limited training or experience in diagnosing and/or treating patients with OI or, in Slavin's case, what ultimately amounted to personal animus toward respondents— seriously calls into question whether Julia's fractures indeed were the result of abuse by her parents. As noted previously, the genetic testing performed on Julia could rule out a diagnosis of OI to only an 85% degree of certainty, and both Slavin and Adams acknowledged that there were other genetic conditions or syndromes that could result in bone frailty. Thus, even before considering the testimony offered by respondents' medical experts, the source of Julia's complex and potentially unrelated injuries is very uncertain.

As to respondents' proof, respondents initially offered the testimony of Karen Narkewicz, a board-certified physician in pediatrics and neonatology and the director of the neonatal intensive care unit at St. Peter's Hospital. After reviewing Julia's medical records and X-ray reports, Narkewicz acknowledged that she could not say with a reasonable degree of medical certainty precisely what caused Julia's fractures, but she remained troubled by the lack of pain and swelling Julia experienced at the fracture sites. Specifically, Narkewicz noted that while such swelling may not be present in a patient with an underlying bone disease, in those circumstances where no such condition existed and a fracture occurred, she has "always see[n] trauma on the skin." Narkewicz also questioned Sanchez's theory of a "unifying diagnosis," testifying that Julia's fractures in December 2003 and her breathing difficulties in March 2004 were not necessarily related. Narkewicz further testified that, unlike Sanchez, she did not believe one could state with reasonable certainty whether Julia's pulmonary edema was the product of an internal or external obstruction. In this regard, Narkewicz was of the view that Julia's breathing difficulties and resulting pulmonary edema were more likely explained by a choking spell. Narkewicz based this opinion upon the fact that Julia had been fed shortly before she was put to bed (indicating that she went to bed with a full stomach), had been given a dose of amoxicillin shortly before bedtime (a

potential irritant/cause of the choking), was heard gurgling and in distress (a sign that she was moving some air), was observed by the responding EMTs to have pink secretions around her mouth mixed in with "spit up" and blood and, most significantly, did not otherwise manifest indications of asphyxia, such as cerebral changes on the CAT scan or impairment of her kidneys, liver or heart function.

Also testifying upon respondents' behalf was Root who, as noted previously, was a board-certified orthopedic surgeon and a renowned authority on OI. Although Root, who examined Julia in April 2005, acknowledged that he did not uncover any "objective evidence" that Julia suffered from OI, he also testified that 10% to 15% of patients who have OI will not test positive in either collagen or genetic testing. Stated another way, 10% to 15% of individuals with OI will test negative via such objective means. Root went on to state, to a reasonable degree of medical certainty, that he did not believe that this was a case of child abuse but, rather, that Julia suffered from a variant form of OI—one where no collagen defect was present—and, further, that she fell into that subgroup of individuals "that would have the negative testing." In this regard, Root admitted that most of the fractures observed in children under one year of age are the product of child abuse and that a significant number of fractures occurring within a short period of time would be more consistent with abuse than OI. Root testified, however, that Julia's fractures had to be viewed in context with her family situation—specifically, the fact that respondents repeatedly sought medical care "any time they had a problem" and, more to the point, that they consistently took Julia to Sood. This was significant in Root's view because, in his experience, parents who are abusing a child usually do not take him or her to the same doctor or emergency room because they do not want the child's injuries to be documented in a consistent fashion. Root also deemed it important that respondents had "two older children that have never had a problem." Thus, Root opined that when he "put it all together . . . this does not represent a case of child abuse."

We now turn to the testimony offered by Lehman who, it will be recalled, is board certified in pediatrics and pediatric rheumatology. Lehman examined Julia in April 2005 and, based upon such examination and a review of her medical records, opined, to a reasonable degree of medical certainty, that Julia was not an abused child. As had Root, Lehman found it signifi-

cant that respondents consistently sought medical care for Julia, stating that such a "pattern of referral would be extremely unusual for someone who is abusing their child." Lehman also stressed the importance of viewing Julia's medical condition in the context of her family situation and the treatment sought for her, stating:

> "It's clear that [Julia] had suffered a number of unexplained injuries. When one sees those unexplained injuries as a physician, one is compelled to consider child abuse, as was appropriately done here. One is also compelled to consider those X-rays not in isolation, but in context of the family, in context of the family's—comport might not be quite the right word there—how a family conducts themselves in view of the history you were given for explanation of those injuries, and in view of the appropriate laboratory findings that one obtains on evaluating the child further."

Lehman went on to conclude:

> "[W]hen this situation and these fractures are viewed in that entire context, one becomes convinced that rather than this being an abused child, this is a child with unexplained fractures that most likely has one of the forms of [OI] or related condition that we're not yet able to identify."

On that point, Lehman conceded that Julia "does not have clinically obvious features of [OI] or other rheumatic disease" and that the "[e]tiology of [her] fractures . . . remains unclear." Lehman testified, however, that "[i]t is well known that our current level of testing does not allow detection of less common variants of [OI] and other conditions which may cause an increased frequency of fracture such as have occurred in this child."[17] Specifically, Lehman opined that current genetic testing for OI remains "dramatically incomplete," noting that "about [10%] of the patients with OI, who obviously have the condition, don't test positive for one of the genes we can look for at this time." Thus, Lehman summarized, while genetic testing can provide an absolute "yes" or "no" for the presence

---

**17.** Indeed, Slavin conceded this very point in the report he dictated following his December 2003 examination of Julia (*see, supra*). As noted previously, the conclusions initially expressed by Slavin in his dictated report were entirely consistent with the testimony subsequently offered by both Lehman and Root.

of a particular mutation, it cannot provide an absolute "yes" or "no" for the presence of OI as "there are mutations [for which] we don't routinely test." For all those reasons, Lehman concluded that Julia suffered from some form of OI and was not, as petitioner contended, the victim of child abuse.

In addition to the foregoing, testimony also was received at the dispositional hearing from court-appointed expert Elizabeth Schockmel, the clinical and forensic psychologist who conducted an extensive evaluation of respondents, their children and Julia's paternal aunt and uncle. Consideration of Schockmel's testimony and resulting written evaluation is, in our view, critical to a sound resolution of these matters, as it provides not only valuable insight into respondents as individuals and parents but, as both Root and Lehman stressed, an appropriate context within which to assess the findings of abuse and neglect.

During the course of her testimony, Schockmel recounted the various materials she received from petitioner, respondents, counsel and Family Court, noting that respondents provided her with "basically everything" that had been given to her by other sources, even though much of that material was not favorable to their position. In assessing the significance of this, Schockmel stated:

> "I think that it demonstrated that [respondents] were prepared to say here is all the data that's available and we want you to have as much of this story as we can possibly bring to you, and that, that was telling to me, that rather than coming into the evaluation and trying to put their best foot forward and hope that I did not have made available to me certain pieces of information, they were willing to share all of it. I think it speaks to the, the credibility of their interview."

Schockmel further noted that respondents immediately and willingly signed any number of releases, again "demonstrat[ing] their desire for [her] to have as much of the picture and to be able to do as thorough a job" as possible.

As to the lengthy interviews conducted with respondents, Schockmel testified that she intentionally conducts long interviews in situations such as this as it is difficult for people in general to maintain a false demeanor over a protracted period of time. In other words, as people tire, they become more honest. Here, Schockmel stated that she saw respondents for a

"very, very long time" and their "affect was always in [her] opinion consistent and appropriate with the topic of material that was being discussed in that moment." Characterizing respondents as "very authentic" and "exceedingly cooperative," Schockmel formed the impression that they were warm, affectionate, loving, strong and supportive individuals, in whom she saw absolutely no evidence of mental illness or emotional instability.[18] Schockmel further testified that no "red flags" were raised with regard to respondents and that she saw no need for them to attend anger management classes. As to respondents' qualities and qualifications as parents, Schockmel testified that respondents, who present as warm and nurturing parents, "would both be very good instructors in a parenting class" and that from what she observed in their interactions with Julia and the concern they expressed for all of their children, respondents evidenced "an extraordinarily high level of sophistication of parenting." Such testimony from this noted psychologist and well-qualified expert paints a far different picture of respondents than the one offered by the foster father who, although a general practitioner, claimed to be able to diagnose mental illness within 15 minutes of meeting someone and, after spending less than one hour with respondents, branded them as "sociopaths."

In light of the foregoing, and upon due consideration of the voluminous record before us, we conclude that the evidence adduced fails to establish, by clear and convincing evidence, that respondents severely abused Julia. Nor are we persuaded that petitioner established, by a preponderance of the credible evidence, that respondents abused Julia and/or derivatively neglected John and Emily. Although our conclusions in this regard are based upon consideration of the record as a whole, we wish to stress that, even without the testimony of Lehman and Root and, indeed, even discounting respondents' entire case, the cited deficiencies in petitioner's own proof—namely, the testimony offered by Sanchez and Slavin, standing alone, casts sufficient doubt upon the cause and source of Julia's various injuries to mandate reversal of Family Court's order. Simply put, even though Sanchez and Slavin each opined that Julia's injuries were the product of abuse, Sanchez's lack of experience with OI, deductive analysis and quest to divine a single solution to the complex host of Julia's various maladies and Slavin's transi-

---

**18.** Schockmel specifically ruled out the possibility of Munchausen syndrome by proxy.

tion from the role of physician to advocate and his resulting crusade to deprive respondents of their children all but eviscerates the value of their medical testimony. When such deficiencies are viewed in the context of the entire record—specifically, the testimony offered by Lehman, Root and Schockmel, it becomes all the more apparent that petitioner's proof falls far short of establishing that respondents severely abused, abused and/or neglected their respective children.

Accordingly, Family Court's order is reversed, the underlying petitions are dismissed, the order of disposition as to John and Emily is vacated and custody of Julia is hereby restored to respondents. Although we are directing that Julia's return to respondents' custody be undertaken without further delay or additional proceedings in Family Court, to the extent that, for whatever reason, further proceedings subsequently are required, we direct that they be brought before a different Family Court Judge.

CARPINELLO, ROSE, LAHTINEN and KANE, JJ., concur.

Ordered that the order is reversed, on the law, without costs, petitions dismissed, order of disposition vacated and custody of Julia BB. is restored to respondents.